(No. 3312—

JAMES REED, Claimant, *vs.* STATE OF ILLINOIS, Respondent.

*Opinion filed August 18, 1939.*

JOSEF T. SKINNER, for claimant.

JOHN E. CASSIDY, Attorney General; GLENN A. TREVOR, Assistant Attorney General, for respondent.

MR. JUSTICE YANTIS delivered the opinion of the court:

Claimant herein had been continuously employed by respondent in its Division of Highways for more than a year prior to May 26, 1937, and had been paid during such time at the rate of One Hundred Twenty-five ($125.00) Dollars per month as an engineering assistant. On the latter date he was engaged in his duties as a cement inspector at the cement plant at the Marquette Cement Manufacturing Company, Oglesby, Illinois. At about 2:00 p. m. he entered an empty railroad box car which was standing on a spur track at the cement plant, for the purpose of tacking a cement inspection report card on the wall of the car. The car was moved toward

the cement loading chute and was suddenly coupled against a loaded car standing there. This sudden stopping of the car caused claimant to lose his footing and to fall on the floor of the car on his right hip. Being apparently injured he was removed to the office of the loading foreman and thence to his home, where he was placed under the care of Dr. Edmund J. Burke of LaSalle, who transferred him to St. Mary's Hospital in that city. Dr. Burke reported the nature of the injury as a fracture of the neck of the right femur and stated the age of claimant to be seventy (70) years. On June 14, 1937, F. L. Sperry, Assistant Engineer of the State of Illinois, visited the claimant in the hospital and at the instruction of Mr. W. L. Glover, Engineer of Materials, endeavored to persuade claimant to go to Chicago at the expense of the Highway Division, to obtain the services of an orthopedic surgeon. The claimant refused these services. On July 20, 1937, M. K. Lingle, Engineer of Claims in the Highway Department, visited the claimant at the hospital and again requested claimant to accept these services, which were again declined. On September 4, 1937, claimant left the hospital at the instruction of Dr. Burke and went home. On December 7, 1937, Dr. Burke reported to Mr. Lingle as follows:

"As compared with the previous X-ray, taken about three months before, there is no evidence of any increase in new bone formation. It must be admitted that this is not distinctly encouraging, although it is by no means surprising with this type of fracture. As the situation now stands, it appears improbable that firm bone union will occur. Fibrous union is possible, provided absorption of the neck of the femur (always a possibility) does not take place. A further discussion of the entire problem with a representative of your office might be helpful, should one be traveling this way in the near future."

On December 20, 1937, A. L. Sand of the Highway Department visited Dr. Burke and the claimant and received from the former the following report, signed by Dr. T. L. Rypina of the X-ray department of St. Mary's Hospital:

"Progress film of the right hip as compared with July 29, 1937, shows beginning of absorption of the neck of the right femur. There continues to be an upward displacement of the major fragment. There is no evidence of union."

At the request of Mr. Sand, claimant on January 5, 1938, reported to Dr. Thomas in Chicago and was examined by the latter. Dr. Thomas' report of such examination shows:

"Fracture of neck of right femur with some upward displacement. The patient walks on crutches, touches leg to floor. No pain. Hip can be flexed

to 60°, abducted to 20°, without causing pain; 1⅛ inch shortening of leg. Patient not desirous of having any surgical intervention, which is quite reasonable for his age. The operative risk is great, and he has many hard vessels. * * *"

Dr. Thomas expressed the conclusion that—

"The patient could do his work as an inspector very well, getting along first on a crutch, later on a cane and probably later without any support, provided he gets fibrous union, or with no union if the fragments adjust themselves to a new position. I think he is going to have a fibrous union. The neck of the femur is all absorbed. He has a great deal of focal infection in his mouth and his arteries are extremely brittle. * * *"

On January 26, 1938, Dr. Burke supplied plaintiff at the cost of the State with an ambulatory splint, and on February 20th claimant began the use of two canes instead of crutches. He was paid his full salary at the rate of One Hundred Twenty-five ($125.00) Dollars per month for the last five days of May, 1937, and for the period from June 1, 1937, to August 17, 1938, he was paid compensation for temporary disability. The total period for which compensation was paid amounted to sixty-four (64) weeks and the total sum so paid was Nine Hundred Nineteen and 43/100 ($919.43) Dollars. Claimant had no children under sixteen years of age dependent upon him for support at the time of the accident. Treatment bills were paid for him by the Division of Highways up to September 7, 1938, in the sum of Six Hundred Ten ($610.00) Dollars. According to his annual earnings his average weekly wage was Twenty-eight and 84/100 ($28.84) Dollars, and his compensation rate $14.42 per week.

The claim herein was filed August 25, 1938. The Court finds from the record that claimant and respondent were on the 26th day of May, 1937, operating under the provisions of the Workmen's Compensation Act of Illinois; that on the date last stated claimant sustained accidental injuries arising out of and in the course of his employment, and that notice of the accident was given to respondent and claim for compensation on account thereof was made on respondent within the time required under the provisions of said Act.

That necessary first-aid, medical, surgical and hospital services have been furnished by respondent.

That the earnings of claimant during the year next preceding the injury were One Thousand Five Hundred ($1,500.00) Dollars, and that the average weekly wage was Twenty-eight and 84/100 ($28.84) Dollars.

That claimant has been compensated for all temporary disability to which he is entitled.

There is some difficulty in determining to what permanent partial disability or specific disability claimant is entitled.

### Dr. Edmund J. Burke testified that—

The last X-ray was made of claimant's right leg on December 4, 1937; that at that time there was no bony union, and that the inference drawn from the X-ray was that there was a fibrous union with absorption of the neck of the femur. There was no disability of the claimant's foot itself and no impairment of motion in his ankle as a result of this injury; that while the knee never works properly in the case of permanent impairment at the hip, the motion of the knee is good and claimant has full extension of the knee itself; that the flexion in the knee of the injured right leg compares favorably with the flexion in the left knee, though not as agile and with a smaller range of motion.

### Dr. Burke further testified that—

In the hip joint there is motion in four directions, extension, flexion, adduction, and abduction. That in claimant's case the flexion of the right hip joint is about 30° active motion, and that in the ordinary case normal flexion would be 90°; that passive motion would be slightly more than the 30° indicated. In abduction, i.e., movement in the hip joint outward from the hip line, claimant has sufficient motion to cross his right leg over the left; further, that claimant can extend his right leg backward about 10° to 15° and there is no partial ankylosis in any of the joints of claimant's right leg.

### The doctor further testified that—

If the claimant were to stand on either leg without the use of a cane he could not move the other leg; that the shortening of the right limb of 1¼ inch to 1½ inch is caused by the absorption of the neck of the femur, and that the weight bearing line in which the fibrous union was formed is not correct, and that the alignment· is not correct because of such shortening of the limb.

### Dr. Burke further testified:

The range of motion of the muscles is better than sometimes results in similar cases, but there is no framework with which the muscular power can adequately be used, and that in his opinion claimant could not do work requiring physical exertion, and that claimant's condition will not improve and that he will not be able to do any work that requires agility.

Claimant testified that he has not been able to perform any work since the date of his accident. That at the time of the hearing he was still using the brace which had been furnished him, and that he gets around fairly well with a cane, walks about a block at a time, and was not hurt anywhere except in the hip joint.

Claimant contends that he has suffered an 80 per cent loss of use of his right leg and seeks an award of Two Thou-

sand One Hundred Ninety-one and 84/100 ($2,191.84) Dollars on the basis thereof.

The record does not disclose what, if any, increase may have resulted in claimant's permanent or specific disability by reason of his refusal or negligence to submit himself to the attention of Dr. Thomas, orthopedic specialist, in Chicago. These requests to him were made on June 14, 1937, and again July 20, 1937. Counsel for claimant contends that the latter was then confined in the hospital at LaSalle and was not discharged therefrom until September 4, 1937, and that on January 5, 1938, when the request was again renewed he took advantage of the offer, and that as the findings of Dr. Burke, under whose care he was at LaSalle, were not at variance with those of Dr. Thomas, no exception should be taken to his earlier refusal of the proffered services of the orthopedic specialist.

*Paragraph (d) of Section 19 of the Workmen's Compensation Act* provides:

"If any employee shall persist in insanitary or injurious practices which tend to either imperil or retard his recovery or shall refuse to submit to such medical, surgical, or hospital treatment as is reasonably essential to promote his recovery, the commission may, in its discretion, reduce or suspend the compensation of any such injured employee."

These provisions are just to both the employer and the employee. In many cases, such as fractures or infections, if proper treatment is received in apt time there is a minimum period of total temporary disability and probable decrease in the permanent disability. The statute contemplates that while the employer is liable for compensation, regardless of the negligence of the employee that may have caused the injury, such employee should cooperate in accepting proper medical and hospital treatment.

While no question is raised as to Dr. Burke's ability or care of claimant, Dr. Thomas is recognized as an orthopedic surgeon of note, and early care at his hands may have resulted in a lessened disability to claimant.

The record does not disclose, however, that such would necessarily have been the case here. Neither does the record disclose that it would have been impossible or dangerous to claimant for him to have been removed to Chicago and placed under the care of Dr. Thomas when first requested six months prior to the time when he finally consented to go. From these facts and the evidence appearing in the record that

claimant is able to use his injured leg, to possess substantial flexion thereof, to have no substantial injury in the knee or ankle, and to be able to walk on the injured leg with the use of a cane, and to stand on the leg, leads to the conclusion that he still possesses substantial use thereof.

The court finds from the evidence that plaintiff has suffered sixty-five (65) per cent loss of use of the right leg as a result of said accident, and under authority of the provisions of the Workmen's Compensation Act of Illinois is entitled to an award for sixty-five (65) per cent specific loss of use of such leg in the sum of One Thousand Seven Hundred Eighty and 87/100 ($1,780.87) Dollars.

An award is hereby made in favor of claimant, James Reed, in the sum of One Thousand Seven Hundred Eighty and 87/100 ($1,780.87) Dollars, such award being payable on the basis of Fourteen and 42/100 ($14.42) Dollars per week. Temporary total disability has heretofore been paid of Fourteen and 42/100 ($14.42) Dollars per week, commencing on the 1st day of June, A. D. 1937, and continuing to August 17, A. D. 1938, the latter being the date to which claimant has heretofore been paid temporary total disability. Payments have heretofore accrued over a period of fifty-two (52) weeks to August 17, 1939, for which compensation is now payable in the sum of Seven Hundred Forty-nine and 84/100 ($749.84) Dollars. The balance of One Thousand Thirty-one and 03/100 ($1,031.03) Dollars is payable at the rate of Fourteen and 42/100 ($14.42) Dollars per week, commencing on the 18th day of August, A. D. 1939, and continuing until the total of such balance has been paid, under the terms of the Workmen's Compensation Act of Illinois.

This award being subject to the provisions of an Act entitled "An Act making an Appropriation to Pay Compensation Claims of State Employees and Providing for the Method of Payment Thereof," approved July 3, 1937 (Session Laws 1937, page 83), and being subject further to the terms of an Act entitled "An Act making Appropriations to the Auditor of Public Accounts for the Disbursement of Certain Moneys until the Expiration of the First Fiscal Quarter after the Adjournment of the next Regular Session of the General Assembly" (Senate Bill 123, as amended), approved July 8, 1939; and being, by the terms of the first mentioned Act, subject to the approval of the Governor, is hereby, if

and when approval is given, made payable from the appropriation from the Road Fund in the manner provided for by the foregoing Acts.